THE STATE EX REL. FREDERICK GOSSELIN, by Next Friend, ELIZABETH GOSSELIN, v. FRANCIS H. TRIMBLE ET AL., Judges of Kansas City Court of Appeals.—41 S. W. (2d) 801.

Division One, September 5, 1931.

*Clif Langsdale* for relator.

*Charles L. Carr* and *Hogsett, Smith, Murray & Trippe* for respondents.

HYDE, C.—This is an original proceeding in certiorari in which the relator asks this court to quash the opinion of the Kansas City Court of Appeals, in the case of Frederick Gosselin v. Yellow Cab Company, decided at its March term, 1930. Relator contends that this opinion is in conflict with the following former decisions of this court: Haehl v. Wabash Railroad Co., 119 Mo. 325, 24 S. W. 737, and Maniaci v. Interurban Express Co., 266 Mo. 633, 182 S. W. 981.

Respondents have filed a motion to dismiss on the ground that relator's brief does not include a fair and concise statement of the facts as required by rule 15 of this court. While relator's brief could be improved by including the matters referred to in the motion, because it is sufficient to show what the issues are, and because of our determination of the case, hereafter stated, the motion will be overruled and the merits considered.

The Court of Appeals finds these facts:

"This is a suit for personal injuries. The appellant, a minor, was the driver of a taxicab. He drove eastward on Twelfth Street in Kansas City, Missouri, with the intention to deliver two passengers at the Muehlebach Hotel. Defendant's cab was standing in front of the hotel and the plaintiff attempted to stop his car in close proximity to the defendant's cab. Plaintiff's cab skidded, and as a result there was a slight collision which did not result in any injury to either cab. Plaintiff alighted from the cab and collected the fare from his passengers. Whereupon, one Daggett, the driver of defendant's cab, walked over to the plaintiff and struck him a terrific blow in the face, thereby causing injuries. Daggett had been sitting in defendant's cab with no passengers, and, so far as the evidence discloses, was doing nothing. Three witnesses testified to the assault. The doorman at the hotel testified that just after plaintiff had discharged his passengers Daggett seemed to be annoyed and jumped out of his car, met plaintiff face to face and said 'What do you mean?' and then struck him without uttering a word. Another taxicab driver said that Daggett, with an oath, said: 'Get that car off of mine.' This witness testified that at the time of the assault the two cars could not get closer than they were; that they were 'jam up against each other.' All of the witnesses

agreed that the plaintiff did not have an opportunity to say any-thing before he was struck. Upon the oral argument counsel for appellant disclaimed any contention that one cab was on top of the other, but the evidence indicates that they were in juxtaposition. The doorman testified that both cars left the scene at about the same time, but there was no evidence that plaintiff's car was moved first, nor was there any evidence from which it could be inferred that the position of plaintiff's car penned in the other car so it could not be conveniently moved. After the blow was struck nothing was done by Daggett to keep the cars from touching, nor to induce the plaintiff to take such action, except that soon after the assault, Daggett drove away.''

The trial court directed a verdict for defendant, upon which judgment was entered and the Court of Appeals affirmed this judgment. In its opinion the Court of Appeals quoted from Haehl v. Wabash Railroad Co., 119 Mo. l. c. 339:

''The principle of *respondeat superior* applies only when what is complained of was done in the course of the employment. The principal is responsible, not because the servant has acted in his name or under color of his employment, but because the servant was actually engaged in and about his business and carrying out his purposes. He is then responsible, because the thing complained of, although done through the agency of another, was done by himself; and it matters not in such cases whether the injury with which it is sought to charge him is the result of negligence, unskillful or of wrongful conduct, for he must choose fit agents for the transaction of his business. But if his business is done, or is taking care of itself, and his servant not being engaged in it, not concerned about it, but impelled by motives that are wholly personal to himself, and simply to gratify his own feeling of resentment, whether provoked or unprovoked, commits an assault upon another, when that has, and can have, no tendency to promote any purpose in which the principal is interested, and to promote which the servant was employed, then the wrong is the purely personal wrong of the servant, for which he, and he alone, is responsible.''

This, it said, ''announces the rule which has been invariably followed in this State.'' The court then said:

''If there is any evidence which would justify a jury in finding that the assault made on the plaintiff was incident to an attempt upon the part of defendant's driver to do his master's business, then we must hold that the case was for the jury. There was no evidence introduced concerning any direct authority given by defendant to its driver; but it was within his implied authority to drive defendant's taxicab, protect the car in his possession from damage, and to eject trespassers. We must therefore determine whether there was any evidence to indicate that he was about the prosecution of such bus-

iness, either in a rightful or wrongful manner. There was no evidence that the defendant's driver was attempting or making preparations to drive defendant's taxicab. The slight collision which did not result in any damage had already occurred, and there was no evidence to indicate that defendant's driver was attempting to prevent or repair damage to the car. No one was attempting to procure passage without payment of fare; and there was no evidence indicating that the blow was struck for the purpose of coercing the plaintiff into moving his car. It was struck simultaneously with the command, not to break down an exhibited inclination to refuse compliance, but evidently as a mere reaction to sudden anger. There is no evidence whatever that the defendant's driver was attempting to perform any duty owing to, or to exercise any power conferred by, his master.

"The words that were uttered by Daggett were not accompanied by a single act that was calculated to keep the cars from touching, nor were they preceded or followed by any such act. There is nothing in the evidence to indicate that such a separation would have saved defendant's car from damage, facilitated its operation, or prevented passage without the payment of fare. The touching of the cars was a harmless technical trespass to be expected in the defendant's business, and if it was within the scope of Daggett's employment to abate such a trespass even when it threatened no damage or interference with defendant's business (which we do not decide), yet the evidence as a whole shows nothing more than a mere possibility that such was his purpose in making the assault."

The court, thus, distinguished Haehl v. Wabash Railroad Co., supra, which was the sole authority cited in its opinion:

"In that case the Supreme Court held that the railroad company was liable for an assault committed by a watchman whose duty it was to keep trespassers off of defendant's bridge. The watchman, while engaged in the performance of such duty, shot a trespasser. The court said that Hill was engaged in the performance of the master's duties; that the business was not done; that it was not taking care of itself, but that the defendant's servant was engaged in it and concerned about it, and that so far as the evidence disclosed, he was not engaged in any other business."

It will therefore be seen that both relator and the court consider Haehl v. Wabash Railroad Co., supra, as the controlling authority decisive of this case. Relator contends that the question of whether the yellow cab driver was engaged in his master's business or merely gratifying his own feeling of resentment, was for the jury. His argument is that the Court of Appeals found that it was within Daggett's implied authority to "protect the car in his possession from damage and to eject trespassers;" that relator, allowing his car to touch and remain against the yellow cab, committed a "techni-

cal trespass;'' and that the command, ''Get that car off of mine,'' was evidence that his purpose in making the assault on relator was to abate the trespass.

We agree that Haehl v. Wabash Railroad Co., supra, states the rule decisive of this case, and we do not find any other authorities which state the principles upon which this case must be decided any more clearly or concisely than the quoted part of the *Haehl case*. The *Haehl case* ''has not only become one of the leading cases in this State . . . but has been frequently cited with approval in text-books and opinions of other States.'' [Maniaci v. Interurban Express Co., 266 Mo. l. c. 645.] We should therefore be particularly careful not to sanction a departure from such a well established authority. [However, for further discussion of the rule see 39 C. J. 1306, secs. 1506-1510; 18 R. C. L. 807, secs. 254-256, 263-265; Whiteaker v. C. R. I. & P. Railroad Co., 252 Mo. 438, 160 S. W. 1009; Phillips v. Western Union Tel. Co., 270 Mo. 676, 195 S. W. 711; Wolf v. Terminal Railroad Assn., 282 Mo. 559, 222 S. W. 114; Smothers v. Welch & Co., 310 Mo. 144, 272 S. W. 678, 40 A. L. R. 1209, see note.]

In the *Maniaci case* the plaintiff, who was injured by the Express Company's agent, was present at the company's invitation and was transacting the business between himself and the company for which he was invited to come to the company's office. The court, in that case, said:

''Upon grounds of public policy, if for no other reason, the *principal* should not be permitted to withdraw from the business and turn the same over to agents who have no regard for the public welfare, and thereby escape responsibility which he would have to bear, if attending to the business in person. It is not imposing too great a hardship upon either corporations or individuals to require them to respond in damages *to legitimate patrons,* for unprovoked, wanton and malicious assaults inflicted upon them, while in the very act of settling their controversies with the agent of the carrier.''

There is a vast difference in the relation and duty of a corporation, engaged in serving the public, to an invitee who, at the request of the company, has come to it to transact the business which the company desires to transact with him and the relation and duty of such corporation to a trespasser or stranger. The *Maniaci case* was a four-to-three decision of this court, *en Banc*, in which two of the majority concurred only in the result, and in which there was a very vigorous dissenting opinion. Because of the different relation of the parties, the opinion of the Court of Appeals, in the case at bar, cannot be said to be in conflict with the Maniaci case.

The Court of Appeals recognizes the rule of the *Haehl case*, as the law of this case; therefore, the conflict, if any, between its opinion and the *Haehl case* must consist of its failure to correctly apply

that rule to the facts it found. It is evident that there was a material difference in the duties and the purpose for which defendant's watchman in the *Haehl case* was employed, and the duties and the purpose for which defendant's driver was employed in this case. In the *Haehl case* the watchman was employed "to keep trespassers off of defendant's bridge; this necessarily involved the duty of putting them off after they got on." Part of the duty of the watchman, therefore, was to use force or violence, if necessary, to keep off or put off of the bridge trespassers who got on or attempted to get on. In fact, so far as the facts of that case disclosed, this was his principal duty. Of course, if he could keep trespassers off or get them off without the use of force, he was expected to do so, and he was not expected to, and had no right to, use more force or violence than was necessary to accomplish this purpose. If he did so, the company employing him was liable to any one injured by his wrongful use of force or violence, because such duties invested him with the authority to make the decision for defendant as to how much force was necessary in any particular case. The company, having delegated such authority to him, made his judgment, on that question, its judgment. As the court says, the defendant was responsible "because the thing complained of, although done through the agency of another, was done by himself; and it matters not in such cases whether the injury with which it is sought to charge him is the result of negligence, unskillful or of wrongful conduct, for he must choose fit agents for the transaction of his business." In the *Haehl case*, the watchman, in the exercise of his duties to put trespassers off of the defendant's bridge, stopped the trespasser and struck him with a club. After thus causing him to turn and run toward the other side of the bridge, the watchman pursued him and shot him before he got off the bridge. He was engaged in the performance of his duty (to put trespassers off of the bridge) when he shot the trespasser in the course of carrying out his idea as to how his duty, of putting him off, should be performed. Therefore, the defendant was properly held liable.

In the present case, the principal duty and purpose for which the Yellow Cab Company employed Daggett was to drive one of its taxicabs. The Court of Appeals found that this implied also the authority to protect the car from damage and to eject trespassers. While it may have been part of his duties to use force or violence to eject trespassers attempting to ride in or damage his car, that is not material here, since no one was attempting to do so. What had happened was that relator's cab slid behind and stopped, touching the back of defendant's cab, but did not damage it or hinder it from being driven forward. There was no evidence that this condition threatened any future damage to defendant's

car. If there was anything to be done about it, it was either to drive his car forward or have relator's car backed. Assuming that it was Daggett's duty to remedy this condition, by causing one or the other to be done; that he had the authority to decide which to do: is there any evidence to show that Daggett, in doing what he did, was acting to have relator's car backed away from defendant's car? The words "get that car off of mine" are the basis of relator's claim that Daggett was acting to abate a trespass and thereby prevent injury to the taxicab in his charge. Relator claims "it was a part of the duty of Daggett in this case to keep other taxicabs off the taxicab he was driving. This necessarily involved the duty of getting them off after they got on." While, even then, it is doubtful if such duty would authorize the use of force or violence against the driver of such cars, but assuming that it was his duty to fight off other cars, by using force against their drivers, if, instead of waiting until the cars touched, Daggett had advanced upon relator while his car was sliding on the wet pavement toward the yellow cab, and saying, "Keep that car off of mine," struck him, there would have been more reason to contend that he was doing his master's business and carrying out his purposes. Likewise, if Daggett had, after the cars were touching, ordered relator to back his car, and, upon his refusal to do so, had then hit him, it could be said that his purpose in doing so was to cause the separation of the cars. So, also, might this be true if, after having been ordered to do so by Daggett, relator had attempted to comply, but was not doing so in the manner or as quickly as Daggett thought he should.

However, what Daggett actually did was to do nothing at all after the impact until relator had let his passengers out of his car and collected their fare. Thereupon he jumped out of his car, walked over to relator, away from the cars, and saying, "What do you mean?" and "get that car off of mine" and adding more violent words, which the court did not set out in full, struck him. Daggett then, without showing any interest in having relator's car moved, got into his car and drove away. Now if Daggett was acting on behalf of his employer to abate a trespass by getting the two cars separated, why did he sit still in his car until after relator's passengers were discharged and had paid their fare? It would seem that, if it was necessary to move relator's car at all, it was necessary to do so as soon as they came together. The only reasonable conclusion is that Daggett was fanning his anger over the occurrence to white heat rather than devising ways and means of preventing imaginary damage to defendant's car, which he could have made sure would not occur by moving it a few feet forward. Certainly, it was not within the scope of his employment to administer punishment even to persons who had damaged his employer's property.

768

[See Brown v. Boston Ice Co. (Mass.), 59 N. E. 644; Cleveland Ry. Co. v. Huntington ('Ohio), 164 N. E. 752; Valley v. Clay (La.), 92 So. 308; Smith & Sons v. Dawson (Ky.), 266 S. W. 926; Grattan v. Suedmeyer, 144 Mo. App. 719, 129 S. W. 1038.] It is true that the words, ''Get that car off of mine,'' taken by themselves, without regard for the rest of the evidence (which was all relator's evidence), might show, as the Court of Appeals says, at least a possibility that his purpose in making the assault was to abate the trespass. However, in determining whether or not he was acting in the course of his employment, what Daggett said must be considered with what he did and the circumstances under which he spoke and acted.

''Each case must be determined with a view to the surrounding facts and circumstances—the character of the employment and the nature of the wrongful act. Whether the act was or was not such as to be within the employment's scope is ordinarily one of fact for the jury's determination. But if the departure from the employer's business is of a marked and decided character the decision of the question may be within the province of the court. 'Where a servant steps aside from the master's business and does an act not connected with the business, which is hurtful to another, manifestly the master is not liable for such act, for the reason that having left his employer's business, the relation of master and servant did not exist as to the wrongful act;' . . .'' [18 R. C. L. 795, sec. 254.]

In Wolf v. Terminal Ry. Assn., 282 Mo. l. c. 563, this court said:

''The fact that the act was done during the time of the servant's employment is not conclusive, nor is the motive of the servant so. The question is, was the act done by virtue of the employment and in furtherance of the master's business? [Hinkle v. Railroad, 199 S. W. 227.] 'Whose business was being done and whose general purposes were being promoted?' [Maniaci v. Express Co., 182 S. W. 981.] Was the servant acting in the line of his employment, about his master's business and seeking to accomplish his master's purpose?''

In the Wolf case, plaintiff, in unloading a freight car on defendant's premises, placed two crates on a gondola car. Defendant's switchmen, who desired to move this car, assisted plaintiff in removing the crates and in doing so injured plaintiff. The court held defendant was not liable, because the switchmen were not acting in furtherance of their master's business, but had temporarily stepped aside therefrom to accommodate plaintiff. The court said that the switchmen were under no obligation to wait until the crates were removed, but could have moved the car with the crates on it, leaving plaintiff, who had no right to put them on it, to wait until they had moved the car. We do not believe that had the switchmen stepped aside from the master's business to give plaintiff a thrashing because

the crates were on the car, instead of so politely helping him to remove them, the court would have held that the switchmen were acting within the scope of their employment, even though while administering the punishment one of them had said, "Get your crates off of that car."

Considering Daggett's words and actions, together with the surrounding circumstance, as showing whose business he was transacting, and considering the different nature of the employment, we hold that the Court of Appeals is not in conflict with the Heahl case in holding that defendants' demurrer to relator's evidence was properly sustained because the assault was not shown to be incident to any attempt upon his part to do his master's business, but was a mere reaction to sudden anger after the slight collision had occurred and was all over.

Relator further complains that the opinion of the Court of Appeals also conflicts with the holding of this court in such cases as Goucan v. Atlas Portland Cement Co., 317 Mo. 919, 298 S. W. 789, that every favorable inference of fact must be made in favor of a plaintiff in ruling on a demurrer to his evidence. But "where the evidence is free from conflict and admits of but one conclusion, the court should withdraw the case from the jury." [38 Cyc. 1534.] And as this court has said: "If, however, there was but one view to be entertained by reasonable men of his conduct, and that view adverse to him, the question resolves itself into a matter of law." [Mockowik v. K. C. St. J. & C. B. R. R. Co., 196 Mo. 550, 1. c. 567, 94 S. W. 256; Hite v. Metropolitan Street Ry. Co., 130 Mo. 132, 31 S. W. 262.] Verdicts cannot be based on speculation or conjecture. [Hamilton v. St. L. & S. F. Ry. Co., 318 Mo. 123, 300 S. W. 767; State ex rel. Wabash Ry. Co. v. Bland, 313 Mo. 246, 281 S. W. 690; State ex rel. Missouri Public Utilities Co. v. Cox, 298 Mo. 427, 250 S. W. 551; Rollison v. Wabash Ry. Co., 252 Mo. 525, 160 S. W. 994.]

We think that the Kansas City Court of Appeals, after giving the relator the benefit of every reasonable inference which could be drawn from the facts, did not contravene the decisions of this court in finding that the evidence, so considered, admits only of the conclusion that the court reached.

Finding, therefore, no conflict, it is ordered that our writ be quashed. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All of the judges concur.